PER CURIAM.
 

 Appellant, Benito Ramirez, appeals his conviction and sentence for first-degree murder, raising three issues for our consideration. Only one of those issues, whether the trial court erred in denying his motion to suppress a taped police interrogation video, is a basis for reversal. The remaining issues do not merit discussion. Because the erroneous admission of the interrogation video necessitates a new trial, we reverse and remand for that purpose.
 

 According to the State’s evidence at trial, Appellant was seen at a restaurant drinking and arguing with the victim, a female companion, on the night of the alleged murder. Appellant and the victim left the restaurant in Appellant’s truck. Later that night, Appellant’s truck was involved in an automobile accident. An officer who arrived on the scene could not locate the truck’s occupants. The next day, the victim’s body was discovered near the scene of the accident with multiple wounds, including a laceration on her back.Appellant fled to Texas on the night of the accident.
 

 Approximately ten months later, police took him into custody and interrogated him. The interrogation was conducted in Spanish. Other officers who did not speak Spanish were also present. After being advised of his Miranda
 
 [1]
 
 rights, Appellant agreed to speak to police. Statements he made throughout the interview indicate reluctance to do so, however. For example, he stated multiple times that the interrogating officer was forcing or obligating him to answer his questions. He never squarely invoked his right to silence, however, so the interview continued. Appellant made several inconsistent statements throughout the interview. By the end of the interview, he admitted to having stabbed the victim after the accident, but he could not remember how many times. In the interview, Appellant claimed he had stabbed the victim in self-defense. In addition, Appellant made many other incriminating statements, such as a denial of knowledge of who the victim was, followed by admissions that he was with her on the
 
 *854
 
 night of the accident and opinions that she was “using” him and had “provoked everything.”
 

 Appellant argues that the trial court should have suppressed the videotaped interview because his statements were obtained through the interrogating officer’s improper promises of help, thus rendering it involuntary. In addition, Appellant points to several of the officer’s statements suggesting, but not directly stating, what that help might be. The parties did not present any evidence at the suppression hearing. The only factors that entered into the trial court’s decision were the contents of the interview itself and the arguments of counsel. Thus, it had no means of assessing any additional factors, such as Appellant’s education level or past experiences, to assist it in determining the voluntariness of Appellant’s statements.
 

 The record does not indicate how long the interview lasted, but the transcript length is 158 pages. The first mention of “help” comes seventy-six pages into the interview, after Appellant had given inconsistent statements about whether he was in possession of his truck at the time of the accident and after he had denied recognizing the victim from a photograph. By that time, Appellant had already protested several times that he was being forced or obligated to answer the detective’s questions. He raised this protest again when being presented with a photograph of the victim. In this context, the detective asked, “How am I going to help you if you’re lying to me and you don’t want to tell me the truth?” The detective then told Appellant what witnesses had said and stated, “[I]f you want us to help you, you need to help us also.” The detective referred to the “help” he could offer Appellant several times, but he never explained the limits of his authority. At one point, he cautioned Appellant, “This is your only chance.” He also warned Appellant that the only way he could “get out of this” was by telling the truth. The detective further stated, “[Y]ou have to tell me, because I’m the only one who speaks Spanish here.”
 

 At one point, the detective offered to tell the state attorney that Appellant had cooperated. Even so, Appellant observed several times that the detective had not yet told him exactly how he could help him. Once, in response to such a question, the detective stated, “I’m going to explain it to you, but first I need to speak to you, because if they know that I promise you something, then nothing is valid, do you understand? You have to have a little bit of faith in me, just like I have to have faith in you. Do you understand what I’m saying?” After Appellant expressed dissatisfaction with this answer, the detective repeated, “I’m going to explain it to you, but I need to talk to your [sic] first, because if I tell you how, then it’s not valid.” This discussion occurred after the detective had advised Appellant, “I can help you, and I can tell the State Attorney that you cooperated .... ”
 

 Shortly after advising Appellant that he could not explain what help he was offering because “they” could not know he promised Appellant anything, the detective asked Appellant another question. Appellant responded, “Before I answer, tell me how are you going to help me?” The officer answered, “I’ve already explained that to you. Your life right now is in my hands.” Appellant replied, “Yes, I know. You’re the law; you can do with me whatever you want.” Up until this point, Appellant had
 
 not given
 
 many helpful answers. He had admitted to owning the truck that was involved in the accident and stated that he was drinking “a little” on the night of the accident. However, he would not even admit to the identity of his brothers.
 

 
 *855
 
 Not long after the detective stated, “You’re life right now is in my hands,” Appellant admitted that the victim was “manipulating” him. When the detective asked a follow-up question to that admission, Appellant stopped, observing, “Sir, I’m sorry, but you haven’t told me how you’re going to help me.” The detective again urged Appellant to “have a little bit of faith” in him and stated that he was the “only one” there who could help Appellant.
 

 Earlier in the interview, the detective had mentioned Appellant’s brothers, who were also in the country illegally. When Appellant asked where his brother Jose was, the detective told him that Jose was detained and that it was Appellant’s fault. He explained, “[W]e wouldn’t have found out about all of your brothers, about your family, if this had not happened. And I think you owe your brothers and your family the right to have an opportunity in this country....”
 

 During the course of the interview, Appellant asked the detective how he was going to help him at least ten times. The detective offered to help Appellant in exchange for cooperation many more times. In denying Appellant’s motion to suppress the interview, the trial court expressed some “reservations” about its decision, as well as a belief that it could grant the motion only if it found an express “quid pro quo” bargain. We must decide whether, under the circumstances of this case, these offers of help rendered Appellant’s statements involuntary, even though they were not directly tied to any specific benefits other than an offer to tell the prosecutor that Appellant cooperated. Because there is no dispute over what statements were made, our task is to review de novo the trial court’s conclusion that the officer’s statements did not render Appellant’s statements involuntary.
 
 See State v. Walter,
 
 970 So.2d 848, 851 (Fla. 2d DCA 2007).
 

 It is well-settled that statements obtained through direct or implied promises are involuntary and, thus, inadmissible at trial.
 
 See Johnson v. State,
 
 696 So.2d 326, 329 (Fla.1997). Although this exclusionary rule was originally instituted out of concerns for the truthfulness of such statements, it is now recognized that such statements may be excluded on due process grounds.
 
 Black v. State,
 
 630 So.2d 609, 615 (Fla. 1st DCA 1993). To exclude a statement on due process grounds, as Appellant urged the trial court to do, a court must find that it was obtained as a result of “overreaching” or coercive conduct by the police.
 
 Black v. State,
 
 630 So.2d 609, 615-17 (Fla. 1st DCA 1993);
 
 Schoenwetter v. State,
 
 931 So.2d 857, 867 (Fla.2006). This Court has explained the standard governing whether a statement is involuntary due to overreaching or coercive conduct as follows:
 

 For a confession or inculpatory statement to be voluntary, the totality of the circumstances surrounding the statement must indicate the statement was the result of a free and rational choice. The mind of the accused should, at the time, be free to act, uninfluenced by fear or hope. To exclude a confession or an inculpatory statement, it is not necessary that any direct promises or threats be made to the accused. It is sufficient if the circumstances or declarations of those present are calculated to delude the prisoner as to his true position and exert an improper influence over his mind. A confession or inculpatory statement is not freely and voluntarily given if it has been elicited by direct or implied promises, however slight.
 

 Walker v. State,
 
 771 So.2d 573, 575 (Fla. 1st DCA 2000) (internal citations omitted). Further, to exclude a statement as involuntary based on improper police tactics, a court must conclude that there is a causal
 
 *856
 
 connection between the improper conduct and the statement.
 
 Blake v. State,
 
 972 So.2d 839, 844 (Fla.2007).
 

 It is also well-settled that an interrogating officer may, without rendering a confession involuntary, promise to make a suspect’s cooperation known to the prosecutor or advise the suspect that “it would be easier on him” if he cooperated.
 
 Blake,
 
 972 So.2d at 844. Confessions or inculpa-tory statements induced by other types of promises may, however, result in suppression at trial.
 
 See id.
 
 Whether a particular confession or statement is rendered involuntary as a result of improper promises depends on the totality of the circumstances.
 
 See id.
 
 at 844-45;
 
 Walker,
 
 771 So.2d at 575. This Court has emphasized that “[e]ach case must be judged on its own unique facts.” Green
 
 v. State,
 
 878 So.2d 382, 384 (Fla. 1st DCA 2003).
 

 The State suggests that Appellant’s statement cannot be considered involuntary because the detective did not make an express “quid pro quo” bargain with him. We disagree. While the presence of an express “quid pro quo” bargain for a confession will render the confession involuntary as a matter of law, see
 
 Walker,
 
 771 So.2d at 575, it is not correct to say that the absence of an express “quid pro quo” bargain insulates police misconduct from claims of undue influence or coercion. The test for determining whether a particular confession or statement is involuntary is still whether, in considering the totality of the circumstances, the reviewing court can conclude that the defendant was unable to make a choice free from unrealistic hope and delusions as to his true position, due to the officer’s conduct.
 
 Walker,
 
 771 So.2d at 575.
 

 Here, the detective’s constant offers of unspecified help were improper. At one point, the detective said to Appellant, “[I]f you want us to help you, you need to help us also.” This statement arguably constitutes an offer of a “quid pro quo” bargain within the meaning of relevant case law. Because this statement is not the only one at issue, however, we decline to reach that conclusion definitively. Instead, we have determined that Appellant’s statement was induced by improper police conduct based on the totality of the circumstances. In addition to making this questionable statement, the detective strongly implied that he had some specific benefit in mind that he could confer on Appellant. While offering this benefit that he would explain later, the detective made references to immigration issues, the opportunity to “get out of this,” and arguably even the death penalty.
 

 Additionally, when Appellant expressed the belief that the detective, as “the law,” could do anything he wanted with Appellant, the detective did not clarify his position. The detective’s failure to explain the limits of his authority is one major factor that sets this case apart from other cases upholding officers’ suggestions that they could help defendants.
 
 Cf. Maqueira v. State,
 
 588 So.2d 221, 222-23 (Fla.1991) (upholding the admission of a confession obtained after an officer agreed to “do whatever possible to help” the defendant but also advised the defendant that he “had no authority to make promises”);
 
 Green, 878
 
 So.2d at 384 (upholding the admission of a statement after officers súggested that the defendant’s cooperation would result in positive recommendations to the prosecutor but cautioned that “making a recommendation was ‘all’ they could do”). Another factor that sets this case apart is the constancy of the offers of help, even in the face of clear signs that Appellant did not understand the limits of the detective’s authority and that Appellant felt he was being forced to answer questions. Fur
 
 *857
 
 ther, the officer appears to have used the fact that only he spoke Appellant’s language as a means of establishing a bond with him so that he could urge him to “have faith” in him and then promise him his “only chance” at help and the only way to “get out of this.” Finally, Appellant’s constant requests for the detective to give him more details of how he could help, even in one instance demanding such an explanation before giving an answer, show a preoccupation with the detective’s promises and an invited expectation of receiving a benefit in exchange for a statement. Even though Appellant’s preoccupation with the promises was readily apparent, the detective never stopped to explain that he had no control over what the prosecutor would choose to do with Appellant’s statement.
 

 Under the unique circumstances of this case, the trial court should have excluded the interview from evidence, at least after the point when the detective began to offer “help.” Accordingly, we reverse and remand for a new trial to be conducted without the benefit of the involuntary interview statements.
 

 REVERSED and REMANDED.
 

 LEWIS and CLARK, JJ., concur; BENTON, J., dissents without opinion.
 

 [1]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).